## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CODY WALTERS, )
           )
        Plaintiff, )
           )    No. 4:13-CV-1475 RLW
        v. )
           )
DIVISION OF YOUTH SERVICES, et al. )
           )
        Defendants. )

## MEMORANDUM AND ORDER

This matter is before the court on Defendants' Motion for Summary Judgment (ECF No. 122) and Defendants' Motion to Strike Expert Report and Exclude Testimony of Anne McCulloch Nelson (ECF No. 124). These motions are fully briefed and ready for disposition.

## BACKGROUND

On April 23, 2011, Plaintiff Cody Walters ("Walters") was a 16 year old resident assigned to the Alpha Group at the W.E. Sears Youth Center ("Sears") in Poplar Bluff, Missouri. (Defendants' Statement of Uncontroverted Material Facts ("DSUMF"), ECF No. 123-1, ¶1). Sears is a residential facility of the Division of Youth Services ("DYS") of the State of Missouri, which provides treatment and services for young men between the ages of 12-17 or 14-18. (DSUMF, ¶2); (Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts ("RSUMF"), ¶2).

Defendant DYS is an agency of the State of Missouri, which at all relevant times, owned, maintained, controlled and/or operated Sears and the Hillsboro Treatment Center ("Hillsboro"). (DSUMF, ¶2). Defendant Richard Stewart has been the Facility Manager at Sears since 2008. (DSUMF, ¶8). Defendant Brian Hicks has been the Assistant Facility Manager at Sears since

either 2008 or 2009 to the present. (DSUMF, ¶10). Defendant Kevin Cooper was the Group Leader for the Alpha group at Sears from approximately October 2008 through April 2014. (DSUMF, ¶12). Defendant Austin Armes was a Youth Specialist II at Sears for the Alpha group from 2010 to the present. (DSUMF, ¶15). Defendant Ashley Bryant was a Youth Specialist II at Sears for the Alpha group from 2010 through 2013. (DSUMF, ¶16). Defendant Mike Burchard was a Youth Specialist II at Sears for the Alpha group from 2010 through 2012. (DSUMF, ¶17). Defendant Greg Adams was a Youth Specialist II at Sears for the Alpha group from 2006 through October 2011. (DSUMF, ¶18). Defendant Jerry Cooper was a Youth Specialist II at Sears for the Alpha group from 2002 through December 2011. (DSUMF, ¶19). Defendant Maison Jackson was a Youth Specialist II at Sears for the Omega group from 2011 through the present. (DSUMF, ¶22). Defendant Paula Shaw was been the Regional Administrator for the Southeast Region of the DYS from 1997 to the present. (DSUMF, ¶24). Defendant Donna Nichols was the Assistant Regional Administrator working in the Southeast Regional Office from 2008 to the present. (DSUMF, ¶28). Defendant Elaine Barbee was the Assistant Regional Administrator for the St. Louis Region of DYS from 2011 to the present. (DSUMF, ¶30). Defendant Janet Smiley has been the Service Coordinator Supervisor for the St. Louis Region of DYS from 1997 to the present. (DSUMF, ¶32). Defendant Kimberly Gosney was a Service Coordinator for the St. Louis Region of DYS from 1997 to the present. (DSUMF, ¶34). Defendant Pokorny was the Regional Administrator for the St. Louis Region of DYS from 2011 to 2013. (DSUMF, ¶36). Defendant Scott Barron was the Facility Manager II at Hillsboro in the St. Louis Region of DYS. (DSUMF, ¶38). Defendant Tim Decker was the Director of DYS in April 2011. (DSUMF, ¶40).

J.L. was a youth committed to DYS in February 2010 at the age of 13. (DSUMF, ¶44; Plaintiffs' Statement of Additional Material Facts "PSAMF", ECF No. 132, ¶1)). J.L. was initially placed at Hillsboro, a secure facility in February 2010. (DSUMF, ¶45; PSAMF, ¶4). Hillsboro is a 30 to 36 bed secure program facility in the St. Louis region that has greater security measures than Sears, including more staff coverage, video surveillance, metal detectors, and perimeter fencing. (PSAMF, ¶10). In September 2010, J.L. underwent a 12 day psychological evaluation at St. Joseph's Hospital. (PSAMF, ¶12). While at Hillsboro, J.L. was involved in several documented altercations. (DSUMF, ¶46). A monthly progress note stated that J.L. and another youth attacked a group member. (DSUMF, ¶47). On October 19, 2010, J.L. flipped over furniture and threw items at staff. (DSUMF, ¶48). On that same day, J.L. punched a staff member in the back of the head, causing the staff member to suffer a bruise. (DSUMF, ¶¶49-50). J.L. was physically restrained for twenty minutes after that incident. (PSAMF, ¶14). On that same day, J.L. attempted to assault staff again. (DSUMF, ¶51). J.L. was physically restrained for ten minutes and mechanically restrained for another twenty minutes. (PSAMF, ¶14). Physical restraint is a method to control behavior injurious to self or others whereby the youth is physically held or confined. (PSAMF, ¶15). Mechanical restraint is the method to control behavior to self or others whereby a youth's movement is physically restricted by mechanical devices (such as waist/chain belts, handcuffs, bracelets/shackles). (PSAMF, ¶16). An advocate note stated that, on November 11, 2010, J.L. assaulted two boys and pulled a fire alarm. (DSUMF, ¶52).[1] On January 26, 2011, J.L. locked himself in a room, broke a coffee pot, and threatened to cut himself with a pole, but no injuries were sustained.

---

[1] J.L. testified that the November 11, 2010 fight at Hillsboro occurred when he and his friends were attacked, which instigated a riot. (DSUMF, ¶98). During the riot, J.L. claims that he stomped on one youth who "went into a seizure" and was taken to a hospital." (DSUMF, ¶99).

(DSUMF, ¶53). On January 26, 2011, J.L. was mechanically restrained for 24 hours because he locked himself in a bathroom and threatened to assault staff with a pole. (PSAMF, ¶20). On February 1, 2011, J.L. pulled the fire extinguishers, sprayed staff, threw the extinguishers at staff, and ran away. (DSUMF, ¶54). J.L. was physically restrained for twenty minutes for this behavior. (PSAMF, ¶21).

J.L. was transferred to Sears on February 7, 2011. Defendant Pokorny approved J.L.'s transfer from Hillsboro to Sears because J.L. was a youth classified for a moderate care facility. (DSUMF, ¶¶64-65).

Defendant Shaw did not receive any information regarding J.L. before he was transferred to Sears. (DSUMF, ¶72). Defendant Nichols approved the place of J.L. at Sears. (DSUMF, ¶74). J.L. was transferred to Sears on February 7, 2011. (DSUMF, ¶75).

J.L. was involved in some documented altercations at Sears prior to April 23, 2011. (DSUMF, ¶76). On February 23, 2011, J.L. punched another youth several times in the head but the youth was not injured. (DSUMF, ¶77). On March 7, 2011, J.L. grabbed another youth's legs and started to struggle. (DSUMF, ¶78). On March 17, 2011, J.L. hit another youth in the face with a clenched fist one to three times. (DSUMF, ¶79). The other youth suffered a nose bleed and his left eye was swollen and bruised. (DSUMF, ¶79). On April 18, 2011, J.L. punched Walters in the back of the head. (DSUMF, ¶81). After J.L. punched him, Walters got J.L.'s arms from both sides, picked him up, and laid him on the ground until the group could restrain him. (DSUMF, ¶82).[2] On April 19, 2011, J.L. attempted to bite another youth's leg. (DSUMF, ¶84).

---

[2] Sears employed a restraint procedure whereby staff and youth worked together to restrain a youth who was acting out. (DSUMF, ¶87).

On April 20, 2011, Defendant Bryant reported that J.L. asked Defendant Bryant what would happen if J.L. set a staff member on fire. (DSUMF, ¶114). J.L. testified that he asked what would happen if he set DYS property on fire. (DSUMF, ¶115). Defendant Bryant wrote J.L.'s comment down in the log book, which was reviewed by Defendants Burchard, Adams, Armes, Kevin Cooper, and Jerry Cooper. (DSUMF, ¶121). Defendant Bryant confronted J.L. regarding the comment and J.L. stated that it was what he came up with "in his mixed up mind." (DSUMF, ¶122). Defendant Burchard and Defendant Adams also confronted J.L. on April 23, 2011 in front of the group regarding his comment. (DSUMF, ¶¶126, 128). As a result of the comment, J.L. was placed on high awareness for a week. (DSUMF, ¶123).

On April 21, 2011, a youth reported to Defendant Armes that J.L. smelled like cigarettes. (DSUMF, ¶132). Defendant Armes searched the bathroom but did not note any smell of cigarettes. (DSUMF, ¶133).

On April 23, 2011, in the late afternoon, the Alpha Group was doing their weekly inventory and J.L. refused to inventory his locker, which entailed removing all clothing from the locker to show staff. (DSUMF, ¶134). After J.L. refused to participate in the inventory, Defendant Armes took all of J.L.'s clothes and put them in a bag and locked them in the staff closet. (DSUMF, ¶135). Defendants claim that J.L.'s bed was also checked that evening. (DSUMF, ¶136). Defendant Armes maintains that he searched J.L.'s clothes due to his comment to Defendant Bryant. (DSUMF, ¶137). Walters, however, maintains that J.L.'s clothes and bed were not searched on July 23, 2011. (PSAMF, ¶¶157-58). On April 23, 2011, Defendant Armes was supervising the Alpha Group because Defendant Bryant had left once all of the youth were in bed at approximately 10:00 p.m. (DSUMF, ¶138). It was common practice for one staff member to leave at 10:00 p.m., even though the Sears/DYS written policy required two staff

- 5 -

members to supervise from 4:00 p.m. until 12:00 a.m. (DSUMF, ¶139). At some point near bedtime, the roof began to leak and J.L's bed became very wet. (DSUMF, ¶140). As a result, Armes moved J.L. into a bunk above Walter's bunk. (DSUMF, ¶141). At approximately 11:00 p.m., as Defendant Jackson was about to leave for the evening from the Oak Cottage, which was in the same building as the Alpha cottage, he offered to watch the Alpha group in order to allow Defendant Armes to go to the bathroom. (DSUMF, ¶143). Armes accepted Jackson's offer and went into the bathroom which was a few feet away. (DSUMF, ¶144). While Armes was in the bathroom, the lights went out for 5-10 seconds. (DSUMF, ¶116, 145). Shortly thereafter, the safety lights came on. (DSUMF, ¶146). When he returned to the Alpha Cottage, Armes saw J.L. standing up on the side of the bunk bed. (DSUMF, ¶150). J.L. poured gas on Walters, who was on the lower bunk. (DSUMF, ¶¶117-118, 151-52). J.L. lit the side of his locker and "everything went up in flames." (DSUMF, ¶118). Defendant Jackson and Armes were 12-16 feet away from J.L. when he started the fire. (DSUMF, ¶154).

J.L. was approximately 14 years old on April 23, 2011. (DSUMF, ¶98). J.L. obtained the lighter he used in the incident while on highway duty within two weeks of being at Sears. (DSUMF, ¶103). J.L. did not know who was on duty when he obtained the lighter. (DSUMF, ¶104). J.L. obtained the gasoline used in the incident from a lawnmower in the shed while he was supposed to be cutting grass. (DSUMF, ¶105). J.L. did not know which staff member was working that day. (DSUMF, ¶107). J.L. said that he initially hid the bottle in his locker and then moved it near a dumpster behind the cafeteria to the cottage, where he kept it until April 23, 2011. (DSUMF, ¶¶108-09). On April 23, 2011, J.L. retrieved the bottle after dinner. He hid it in his pocket and brought it back to the cottage undetected. (DSUMF, ¶110). After two months at Sears, J.L. was placed into a secure program at Montgomery City. (PSAMF, ¶6).

Walters lived at Sears from September 2009 until April 23, 2011. (DSUMF, ¶92). Walters testified that he never saw a youth in possession of a weapon while he was at Sears. (DSUMF, ¶93).

In Count I, Walters alleges a claim against Defendants Stewart, Hicks, Kevin Cooper, Armes, Bryant, Burchard, Adams, Jerry Cooper, Jackson, Shaw, Nichols, Barbee, Smiley, Gosney, Barron, Pokorny, Decker and John/Jane Doe 1-10 in their individual capacities pursuant to 42 U.S.C. §1983 for damages for Defendants' deprivation of Walters' constitutionally protected rights by reason of Defendants' failure to protect Walters in violation of his Eighth and Fourteenth Amendment Rights. (Second Amended Complaint ("SAC"), ECF No. 83, ¶24).[3] Count I is not directed towards DYS. (*Id.*). In Count II, Walters alleges a negligence claim against Defendants DYS, Stewart, Hicks, Kevin Cooper, Arms, Bryant, Burchard, Adams, Jerry Cooper, Jackson, Shaw, Nichols, Barbee, Smiley Gosney, Barron, Pokorny, Decker, and John/Jane Doe 1-10. (SAC, ¶49).[4]

## DISCUSSION

## I. Motion for Summary Judgment

### A. Standard of Review

_____

[3] Count I is alleged against the individual defendants in their individual capacities, not in their official capacities. However, even if Defendants had been named in their official capacities, the result would not be any different as to the §1983 claim. Naming a government official in his or her official capacity is the equivalent of naming the government entity that employs the official, in this case the State of Missouri. *Will*, 491 U.S. at 71. "[N]either a State nor its officials acting in their official capacity are 'persons' under § 1983." *Id.* As a result, the complaint fails to state a claim upon which relief can be granted against defendants in their official capacities as to Walters' §1983 claim.

[4] On July 27, 2015, John/Jane Doe 1-10 were dismissed without prejudice by this Court's Order (ECF No. 158).

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.* Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. *Anderson*, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex Corp.*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Torgerson*, 643 F.3d at 1042 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

**B. 1983 Claim**

In the Second Amended Complaint, Walters alleges that Defendants Stewart, Hicks, Shaw, Nichols, Barbee, Smiley, Gosney, Barron, Pokorny, Decker and John/Jane Doe 1-10 failed to act reasonably and were deliberately indifferent to the rights of Walters in that said Defendants:

- Failed to implement and/or enforce adequate policies and procedures for the care, supervision, placement, and safety of residents, including Walters;

- Caused, permitted, and allowed a custom and practice of continued and persistent deviations from the aforesaid policies and procedures;

- Failed to train and/or instruct Youth Center employees, agents and servants to properly search, supervise, and monitor youth residents;

- Allowed hazardous or dangerous items including gasoline and lighters to be and remain on the premises and in possession of youth residents; caused and/or permitted a violent resident with access to a hazardous or dangerous substance and dangerous items to be housed with other residents, including Walters;

- Failed to segregate a known violent and assaultive resident from other residents;

- Failed to implement and enforce existing policies and procedures for the entry and/or placement of youth into the facility;

- Authorized, allowed, and permitted a juvenile with a known history of violent and assaultive behavior, and who had threatened the safety of youth and staff at Hillsboro Treatment Center, to be placed in the Youth Center; and/or

- Failed to protect Walters from a known risk of being physically harmed by another juvenile.

(SAC, ¶41).

Likewise, in the Second Amended Complaint, Walters alleges that Defendants Stewart, Hicks, Kevin Cooper, Armes, Bryant, Burchard, Adams, Jerry Cooper, Jackson, and John/Jane Doe 1-10 failed to act reasonably and were deliberately indifferent to the rights of Walters in that said Defendants:

- • Failed to follow mandated procedures regarding the supervision and monitoring of residents including resident J.L.;

- • Failed to follow mandated policies and procedures regarding the search of residents, resident lockers, and resident beds;

- • Caused, permitted and allowed youth resident J.L. to obtain and possess a hazardous or dangerous substance or dangerous items including gasoline and a lighter;

- • Failed to take reasonable measures to report and/or act upon statements made by resident J.L. indicating an intent to harm someone by setting them on fire; and/or

- • Failed to supervise and monitor residents during the nighttime hours.

(SAC, ¶42).

### 1. Failure to Protect

Essentially, Walters is alleging a §1983 claim for failure to protect him when J.L. set him on fire on April 23, 2011. Defendants assert they are entitled to qualified immunity on Walters' claim they failed to protect him. To state a failure-to-protect claim, Walters was required to allege that (1) defendants were aware of facts from which they could infer the existence of a substantial risk of serious harm to him, (2) they actually drew the inference, and (3) they failed to take reasonable steps to protect him. *See Farmer v. Brennan,* 511 U.S. 825, 836–38, 844 (1994); *Schofield v. Hopkins*, 491 F. App'x 772, 774 (8th Cir. 2012). "[T]he eighth amendment's

prohibition against cruel and unusual punishment requires ... officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other[s]." *Young v. Selk,* 508 F.3d 868, 871–72 (8th Cir. 2007) (quoting *Farmer,* 511 U.S. at 832). Officials act unreasonably—thereby violating the Eighth Amendment—when they are "deliberately indifferent to a 'substantial risk of serious harm.'" *Id.* at 872 (quoting *Farmer,* 511 U.S. at 828).[5] To prove deliberate indifference, an inmate must make a two-part showing: "The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.' " *Irving v. Dormire,* 519 F.3d 441, 446 (8th Cir. 2008) (quoting *Farmer,* 511 U.S. at 834) (internal citation omitted). The deprivation is "'objectively, sufficiently serious,' [under the first requirement when] the official's failure to protect resulted in the inmate being 'incarcerated under conditions posing a substantial risk of serious harm.' " *Young,* 508 F.3d at 872 (quoting *Farmer,* 511 U.S. at 834). "An official is deliberately indifferent [under the second requirement] if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* at 873 (citing *Farmer,* 511 U.S. at 844– 45, 114 S.Ct. 1970).

First the Court readily finds that pouring gasoline and lighting on fire of Walters constitutes "harm," *Jensen v. Clarke,* 94 F.3d 1191, 1198 (8th Cir.1996), that is "sufficiently serious to amount to a deprivation of constitutional dimensions." *Riley v. Olk-Long*, 282 F.3d 592, 595 (8th Cir. 2002). The Court thus turns to a discussion of whether Defendants were deliberately indifferent to that risk.

---

[5] The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment and extends protection from deprivations that are intended to punish. *Hott v. Hennepin Cnty., Minnesota*, 260 F.3d 901, 905 (8th Cir. 2001).

When considering the second requirement, the court asks whether Walters has presented sufficient evidence of the subjective aspect of his Eighth Amendment claim. "To meet this requirement, [Walters must] show that the defendants exhibited a sufficiently culpable state of mind, that is, [they] must have been deliberately indifferent to the substantial risk of serious harm to [Walters]." *Young,* 508 F.3d at 873 (citation and internal quotation marks omitted). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* (citing *Farmer,* 511 U.S. at 844–45). "The question of whether the official knew of the substantial risk is a factual one 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Id.* (citing *Farmer,* 511 U.S. at 842). Walters need not show that an "official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842. Moreover, "in order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant ... specifically knew about or anticipated the precise source of the harm." *Kahle v. Leonard,* 477 F.3d 544, 551 (8th Cir.2007) (quoting *Krein v. Norris,* 309 F.3d 487, 491 (8th Cir.2002)).

Defendants argue that they had no way to anticipate that J.L. would cause serious harm to Walters and that "in fact J.L. did not pose a substantial risk of serious harm to Plaintiff." (ECF No. 123 at 17-18). Rather, Defendants claim that J.L. setting Walters on fire was merely the result of "two highly unusual events"—the soaking of J.L.'s bed, which caused J.L. to bunk with Walters, and the lights going out in Walters' room, which gave J.L. cover to move about in the dark—that allowed the incident to occur. (ECF No. 123 at 18). Defendants argue that, even if J.L. had the gasoline, he would not have posed a serious risk of harm to Walters absent these two unlikely events. (ECF No. 123 at 18).

- 12 -

In his opposition to Defendants' Motion for Summary Judgment, Walters argues that he has sufficiently demonstrated that Defendants had reason to believe that J.L. posed a serious risk of danger to Plaintiff. First, Walters notes that an official's knowledge need not be particularized as to only the plaintiff, but may be "because all prisoners in his situation face such a risk." (Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opposition"), ECF No. 130, at 10). Second, Walters maintains that he testified that he feared for his safety at Sears. (Opposition at 10). Specifically, Walters testified that youth at Sears had to "watch their backs" and that "being nervous was normal." (Opposition at 10). Third, Walters maintains that Defendants did not have to have knowledge of the particular harm that would befall Walters, *i.e.*, being set on fire. (Opposition at 11). Fourth, Walters claims that Defendants minimize J.L.'s "assaultive conduct" and Defendants' "failure to provide adequate security at Sears." (Opposition at 12). Walters maintains that it is "the combination of JL's threat to youth safety and Defendants' persistent and ongoing violations of safety and security policies and procedures that drives [sic] Plaintiff's §1983 claims." (Opposition at 12).

Walters argues that J.L. posed a substantial risk of serious harm based upon several altercations involving J.L. (Opposition at 17). Walters argues that J.L. was involved in an altercation at Sears every day of the week and a fist fight at least one day per week at Sears. J.L. broke the nose of a Sears youth in an unprovoked attack. J.L. also threatened staff on several occasions and said he was willing to do anything to get out of Sears. (Opposition at 17). J.L. was on "high awareness" status due to his attack on a youth and because he asked what DYS would do if a youth set a staff member on fire. (Opposition at 17-18). Finally, there were reports that J.L. was smoking in a cottage bathroom two days before he attacked J.L. (Opposition at 18).

The parties further dispute whether the individual Defendants were aware that J.L. posed a serious risk of harm to Walters for various reasons.

- Defendants Gosney, Smiley, Barbee, Barron, and Pokorny

Defendants argue that summary judgment should be granted in favor of Defendants Gosney, Smiley, Barbee, Barron, and Pokorny because they worked in the St. Louis region, did not work at the Sears Center, and had no involvement in the Sears operation. (ECF No. 123 at 11). Only Gosney received Critical Incident Reports ("CIR's") from the Sears Center. (ECF No. 123 at 11). Defendant Gosney's job duties were to oversee the commitment of youth in the St. Louis region assigned to her, which entailed developing the treatment plan, the aftercare plan, and making sure all required services were in place through monthly meetings with youth, reviewing advocate notes, and talking to parents and service providers. (DSUMF, ¶35). Therefore, Defendants argue that these Defendants lacked any personal involvement in the incident and did not have the capability to ignore any risk to Walters because they were not present at Sears. (ECF No. 123 at 11-12).

Walters argues that Barbee, Barron, and Pokorny had knowledge of J.L.'s "substantial risk" to youth safety at Hillsboro and "there is a reasonable inference that they had knowledge of a substantial risk to youth safety at Sears." Walters also claims that Defendants Barbee, Barron, and Pokorny were deliberately indifferent to the risk J.L. posed to youth safety at Sears, a less secure facility than Hillsboro. (Opposition at 16). Walters maintains that Barbee and Barron requested J.L.'s placement at Sears and failed to share details of J.L.'s assaultive history with Sears staff. Walters asserts that Pokorny testified that he approved the transfer of J.L. to Sears because J.L. to Sears only because J.L. had been assessed for a moderate care facility a year earlier and Sears was a moderate care facility. (Opposition at 16). Walters argues that Gosney

- 14 -

knew J.L. assaulted Hillsboro staff, knew J.L. was placed in juvenile detention because of fights at Hillsboro, knew J.L. switched groups at Hillsboro when he returned from juvenile detention due to his threat to safety, knew J.L. was exchanging letters with a gang member, and J.L. attacked Walters and another Sears youth. (Opposition at 23-24).

- Defendant Decker

Defendants argue that Defendant Decker, who was the Director of DYS at the time Walters was injured, should be granted summary judgment because he did not have any involvement in the day-to-day operations of Sears and did not receive CIR's from Sears. (ECF No. 123 at 12).

In response, Walters states that Defendant Decker was deliberately indifferent in his official capacity, which binds the DYS, in that he authorized Sears staff to violate the Double Coverage policy on the evening shift. (Opposition at 24, n.2).

- Defendants Hicks, Kevin Cooper, Jerry Cooper, Burchard, Adams, and Bryant

Defendants argue that the Court should grant summary judgment to Defendants Hicks, Kevin Cooper, Jerry Cooper, Burchard, Adams, and Bryant because they were not present at the time the incident occurred. (ECF No. 123 at 12). Defendants contend that these defendants lack any personal involvement in the incident and "did not have the capability to ignore any risk to Plaintiff as they were not present." (ECF No. 123 at 12).

Defendants assert that these defendants did not know all of the information regarding J.L.'s potentially dangerous conduct. Jerry Cooper was aware of J.L.'s February 2011, March 17, 2011, April 18 and 19, 2011 incidents prior to April 23, 2011. Defendant Bryant did not know about J.L.'s incidents at Hillsboro or that J.L. punched Walters prior to April 23, 2011, but he was aware of the reports on the February 23, March 7, March 17, and April 19, 2011

- 15 -

incidents. (ECF No. 123 at 13). Defendant Burchard was aware of the reports on the February 23, March 7, March 17, and April 19, 2011 incidents. (ECF No. 123 at 13). Defendant Hicks did not recall if he was aware of the April 18 and 19, 2011 incidents. Defendant Kevin Cooper was not aware of the November 11, 2010 incident. (ECF No. 123 at 13), but Defendant Kevin Cooper was aware of the February 23, March 7, March 17, and April 19 incidents. Defendant Adams was not aware of the November 11, 2010 incident prior to April 23, 2011, but he recalled knowing about J.L. punching another youth and about the March 17 and April 18, 2011 incidents. Defendant Hicks was not aware of J.L.'s comment to Bryant.

Defendants further maintain that they took reasonable steps to address J.L.'s inquiry regarding setting a staff member on fire. (ECF No. 123 at 14). Defendant Bryant confronted J.L. regarding his comment, and J.L. responded that the comment was from his "mixed up mind." (ECF No. 123 at 14). Defendant Burchard also confronted J.L. in front of the group, and J.L. stated he was having a bad day and did not mean it. (ECF No. 123 at 14). Defendant Kevin Cooper also addressed J.L.'s comment with the group the following day and Defendant Kevin Cooper stated that J.L.'s statement was unacceptable. (ECF No. 123 at 14). Defendant Adams discussed J.L.'s comment with the group on April 23, 2011. (ECF No. 123 at 14). Defendant Armes addressed it with J.L., who responded that he was just talking out of anger. (ECF No. 123 at 14).

Walters maintains that these Defendants had sufficient knowledge to be aware that J.L. posed a serious risk of harm to Walters. Walters contends that Defendant Hicks knew J.L. was a gang member, that J.L. came from a lockdown facility, that J.L. exchanged letters with a fellow gang member at Sears, and that J.L. felt good after he attacked another person. (Opposition at 21). Walters claims that the Alpha Group Defendants (K. Cooper, Armes, Bryant, Adams, J.

- 16 -

Cooper, and Burchard) knew that J.L. was gang affiliated, knew J.L. threatened to set staff on fire, and knew J.L was violent and had made unprovoked attacks on youth. (Opposition at 18-19).[6]

- Defendants Stewart, Shaw, and Nichols

Defendants argue that the Court should grant summary judgment to Defendants Stewart, Shaw, and Nichols because they were not present at the time the incident occurred and they had no knowledge of any substantial risk to Walters from J.L. (ECF No. 123 at 15). Defendants maintain that Defendants Shaw and Nichols are the regional administrator and assistant regional administrator and they did not work or supervise youth at Sears, nor were they present when the incident occurred. (ECF No. 123 at 15).

In response, Walters argues that Stewart should not have accepted J.L. into Sears when Stewart knew that Sears was less equipped with security measures than Hillsboro. (Opposition at 22). Walters contends that Defendant Stewart knew J.L. was a gang member, that J.L. came from a lockdown facility, that J.L. exchanged letters with a fellow gang member at Sears, that J.L. had threatened the safety of youth at Hillsboro and had assaultive behavior at Hillsboro, and that several Sears staff had a year or less of experience and needed additional training. (Opposition at 21). Walters maintains that Shaw and Nichols knew J.L. had attacked youth at Sears at least two times before assaulting Walters and that J.L. had been placed in physical restraints after those attacks. (Opposition at 22-23). Walters also notes that Shaw had admonished Nichols for her lack of oversight.

- Defendant Jackson and Armes

---

[6] Defendant Burchard did not know that the J.L. had gang affiliations. (Opposition at 18).

Defendants contend that Defendant Jackson is entitled to summary judgment because he had no knowledge regarding J.L. that would have indicated Walters would have faced a substantial risk of serious harm from J.L. (ECF No. 123 at 16-17). Defendant Jackson worked with the Omega Group, not the Alpha Group, and did not have any previous involvement with J.L. (ECF No. 123 at 17). Defendants claim that Defendant Jackson had no responsibility to take any action regarding the Alpha group. (ECF No. 123 at 17). Defendants claim that Defendant Armes had no basis to believe that J.L. posed a substantial risk of serious harm to Walters. (ECF No. 123 at 17). In addition, Defendants claim that Armes reasonably addressed J.L.'s comment regarding setting a staff on fire, and had searched J.L.'s clothes and locker on the day of the incident. (ECF No. 123 at 17).

Walters argues that Jackson knew that J.L was a trouble maker for the Alpha Group and knew he was the only staff on duty supervising the Alpha youth on April 23, 2011 when Armes left to use the restroom. (Opposition at 19). In addition, Walters states that J.L.'s bed was not searched, J.L. refused to do his clothing inventory, and J.L's person was not searched on the evening of April 23, 2011. (PSAMF, ¶¶157-58).[7] Walters asserts that J.L. was instructed to sleep in Walters' bunk on April 23, 2011 even though J.L. was supposed to be monitored. (Opposition at 20). Walters also claims that Armes and Jackson violated the Awareness Supervision Policy and Bedtime Protocol when they failed to address J.L. dismounting his bed without permission and did not see J.L.'s actions until after he had emptied a full tea bottle of gasoline and set fire to Walters. (Opposition at 20)

The Court finds that the Defendants are entitled to qualified immunity as to Walters' §1983 claims. *See Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998) (quoting *Malley v.*

---

[7] An issue of fact exists regarding whether J.L.'s bed and person were searched on April 23, 2011. (DSUMF, ¶¶133-135).

*Briggs,* 475 U.S. 335, 341(1986) ("Qualified immunity protects 'all but the plainly incompetent or those who willingly violate the law.'"). As an initial matter, the Court does not believe that Defendants were deliberately indifferent to the known risk of J.L. Rather, the record indicates that Defendants could not reasonably anticipate that J.L. posed a threat of serious violence to Walters. In addition, the Court believes that Defendants reasonably responded to any threats made by J.L.

Here, J.L. had not been a persistent violent offender. As noted by Defendants, J.L. had behaved badly on several occasions but had never caused serious injury to another resident. (ECF No. 142 at 9). J.L. had a history of minor skirmishes with other young males and staff at both Hillsboro and Sears. J.L.'s behavior, however, could not be described as "violent, aggressive, assaultive, and out of control." *Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010). Defendants argue that Walters mischaracterizes the evidence of J.L.'s prior incidents committed while at Hillsboro and Sears. The Court agrees; the prior incidents are all relatively minor assaults that, with the possible exception of one or two incidents, did not result in any injury and were quickly subdued. *See Prater v. Dahm,* 89 F.3d 538, 541 (8th Cir.1996) (duty to protect inmates from attacks requires only that prison officials take reasonable measures to abate substantial risks of serious harm of which they are aware). The only injury incurred by J.L. to another youth at Sears was a bloody nose. (ECF No. 142 at 8; DSUMF, ¶79).[8] Further, threats to staff members were common at Sears and, as a result, cannot form the basis of a deliberate indifference claim alone. *See* DSUMF, ¶7; *Jackson*, 140 F.3d at 1152 (citing *Prater,* 89 F.3d at 541) ("threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.").

---

[8] Walters claims that he has alleged a serious injury, which occurred at Hillsboro. *See* ECF No. 154 at 2 (citing ECF No. 130 at 23 (citing PSAMF, ¶¶300-310)).

Moreover, based upon the safe atmosphere at Sears and the officers' response to J.L.'s threat, the Court finds that Walters has not demonstrated that Defendants recklessly disregarded an objectively serious risk of harm to Walters by placing J.L. in the same room as him. That is, the §1983 claims against Defendants are barred by qualified immunity because Plaintiff's claims of failure to protect and failure to train do not rise to the level of constitutional violations under the facts alleged.

Walters likens this case to *Krein* where the Eighth Circuit declined to give prison guards qualified immunity regarding a "surprise attack" because "plaintiff ... has specifically alleged that, 'by failing to provide adequate security in an open barracks,' defendants were deliberately indifferent to a risk of harm to plaintiff." *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002). However, the circumstances of the prison in *Krein* stands in stark contrast to the relatively safe environment at Sears. In *Krein*,

> the district court determined that there was evidence in the record to support the following assertions: defendants' failure to abide by staffing requirements created an environment which posed a risk of harm to all inmates housed in the barracks area; the [North Central Unit] NCU had one guard for three barracks housing 150 inmates; defendants were or should have been aware of an inadequate staffing problem as early as August 1997 and yet they had made no staffing changes as of January 1998, when the attack occurred; the level of violence in Barracks # 1 was five times that of any other NCU barracks and yet staffing adjustments were not made to address the disparity; the number of isolation cells was inadequate; and [Arkansas Department of Corrections] failed to keep track of the number and locations of assaults occurring within the NCU.

*Krein*, 309 F.3d at 489-90. In contrast, the evidence before the Court indicates that Sears was a safe facility for residents. Although Walters testified that youth had to "watch their backs at Sears" and that "being nervous was normal," he also testified that he was never scared of any individual at Sears. (DSUMF, ¶85). The evidence demonstrates that fights were rare at Sears and quickly controlled. (DSUMF, ¶87). Walters testified that while at Sears he never saw another youth in possession of a weapon. (DSUMF, ¶92). Prior to the events on April 23, 2011,

Walters and J.L. got into only one very brief altercation where no one was hurt. (DSUMF, ¶¶93-94).

Further, the evidence showed that the officers quickly and reasonably responded to every incident and threat described herein. *See Jackson*, 140 F.3d at 1152 (no deliberate indifference where guard failed to separate two inmates and to check for weapons in the barracks where the guard "promptly investigated, and the two persons with direct knowledge of the alleged problem denied its existence"). After J.L. asked about setting a staff member on fire, he was immediately confronted regarding his question and placed on high awareness for a week. (DSUMF, ¶¶120-23). High awareness meant that when the group moved J.L. would be in the middle with two people on each side of him, and that when the group was seated he would have to ask to get up or do anything with the group. (DSUMF, ¶¶122-23). In addition, J.L. was asked about his question in front of the group on at least three occasions by Defendant Burchard, Defendant Kevin Cooper, and Defendant Adams. (DSUMF, ¶¶125-127). Further, Defendant Armes asked J.L. about his question and J.L. indicated that he was just talking out of anger. (DSUMF, ¶128). The Court also holds that the possible failure to perform a bed check and body search of J.L. does not constitute deliberate indifference in light of the other security measures taken by Sears staff. *Jackson*, 140 F.3d at 1153 (guard's "failure to take additional security measures, even if arguably negligent, cannot constitute reckless disregard of a known risk").

Further, the Court does not believe that each individual defendant was deliberately indifferent and failed to protect Walter. The Court finds that Barbee, Barron, and Pokorny, who worked in the St. Louis region, were too far removed from the Sears program to be held liable for deliberate indifferent. The Court finds no evidence of a serious injury at Hillsboro which would have prevented J.L.'s transfer to Sears. Moreover, J.L. was at Sears for two months prior

to the April 23, 2011 incident, which further removes those defendants from any liability as a result of the transfer. Further, the Court also does not find that Kevin Cooper, Armes, Bryant, Adams, Jerry Cooper, Burchard, and Jackson were deliberately indifferent to Walters' rights. The Court finds that the overall safety record of Sears overcomes the relatively minor skirmishes of J.L. at Sears. Further, these Defendants' mere knowledge that J.L. was in a gang also is not indicative of deliberate indifference because most Sears residents were gang affiliated. (DSUMF, ¶6). The Court finds that Jackson's mere knowledge that J.L. was a troublemaker and that he was the only staff on duty when Armes briefly left to use the restroom is not demonstrative of deliberate indifference. The Court further finds that Stewart and Hicks' knowledge of J.L's gang affiliation and that he came from Hillsboro, a more secure facility, is insufficient to demonstrate that they were deliberately indifferent to Walters' safety. The Court believes that Shaw and Nichols, who did not work at Sears or supervise youth at the Sears, were not deliberately indifferent simply because they knew J.L. had attacked other kids and because Shaw admonished Nichols for her lack of oversight. Similarly finds that Defendant Gosney, who did not work at Sears, was not involved in Sears' operations and cannot be held liable simply because she knew that J.L. had attacked youth at Hillsboro. The Court again notes that no one was seriously injured in J.L.'s altercations with other youth and this cannot support a deliberate indifference claim. *See Lenz v. Wade*, 490 F.3d 991, 995-96 (8th Cir. 2007) ("[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisor liability")(citation omitted). Finally, Walters admitted that Defendant Smiley does not have the requisite subjective knowledge to be found deliberately indifferent, and Walters contends that Defendant Decker was deliberately indifferent in his official capacity, "which binds the DYS, in that he authorized Sears staff to violate the Double Coverage policy on the

- 22 -

evening shift." (Opposition at 24, n.2). As discussed herein, all of the Defendants in Count I were named in their individual capacities and any purported claim against them in their official capacity fails. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

Based upon the foregoing, the Court finds that Defendants in Count I did not know of a substantial risk to Walters and failed to respond reasonably to it. Therefore, the Court grants Defendants' Motion for Summary Judgment as to the failure to protect claim in Count I.

### 2. Policy Violations

Walters also argues that Defendant DYS violated several policies, particularly the awareness supervision policy, the gasoline policy and the double coverage policy. (Opposition at 28-31). As an initial matter, Walters did not name DYS as a defendant in Count I. (SAC, ¶24). Further, DYS is not a proper defendant to a municipal policy §1983 claim. A municipality or other local government may be liable under §1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011). However, "[t]he State of Missouri is immune from suit under the Eleventh Amendment since it did not consent to this suit." *Tramble-Bey v. Skiba*, 25 F. App'x 486, 487 (8th Cir. 2002) (dismissing §1983 action against the State of Missouri); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984) ("in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"). Thus, Walters cannot state a §1983 claim against DYS for violation of a municipal custom or policy because DYS is not a municipality but a state entity immune from suit under §1983. *Will*, 491 U.S. at 71 ("neither a State nor its officials acting in their official capacities are "persons" under § 1983"); *cf. Russell v. Hennepin Cnty.*, 420 F.3d 841, 846 (8th

- 23 -

Cir. 2005) ("A municipality may be liable under § 1983 when an official municipal policy or custom caused a violation of a plaintiff's substantive due process rights."); *Hayes v. Faulkner County,* 388 F.3d 669, 674 (8th Cir. 2004); *see also City of Canton v. Harris,* 489 U.S. 378, 389-91 (1989) (requiring that a plaintiff establish a municipal policy or custom that caused a deprivation of his constitutional rights).

In addition, and to the extent that Walters attempts to allege a §1983 based upon a policy violation, Walters cannot state a §1983 claim against Defendants simply by stating that they violated a DYS policy. Rather, there must be some evidence that the violation of a policy resulted in a deprivation of Walters' constitutional rights. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (failure to follow procedure to process grievances did not confer any substantive rights to inmates); *Hott v. Hennepin Cnty., Minnesota*, 260 F.3d 901, 907-08 (8th Cir. 2001) (failure to conduct checks according to ADC policy did not amount to deliberate indifference to inmate's needs). Finally and for the reasons stated herein, the Court holds that the violation of any policy did not result in a deprivation of Walters' constitutional rights.[9]

• Transfer Policy

As an initial matter, the Court finds that there is no evidence that Defendants violated Walters' constitutional rights regarding the any policy by transferring J.L. to Sears. The evidence demonstrates that the officers chose to transfer J.L. from Hillsboro to Sears because he was classified to be in a moderate secure facility (DSUMF, ¶45). Further Defendant Pokorny stated that he approved the transfer to Sears because it offered a fresh start for J.L. away from his bad influences in St. Louis, because other St. Louis residents had been successful at Sears, and because he relied on Defendant Barbee's recommendation. (DSUMF, ¶65). Further Defendant

---

[9] To the extent that Walters attempts to state a claim against any of the individual Defendants in their official capacity, those claims fail as well. *See Will*, 491 U.S. at 71.

Stewart testified that he agreed to take J.L. because several youth had done well at Sears after transferring from an urban environment and he had no reason to believe that Sears could not help J.L. (DSUMF, ¶7). The Court finds that the reasons given for J.L.'s transfer were reasonable and, therefore, the transfer did not violate Walters' constitutional rights as a matter of law.

- Gasoline Policy

Walters argues that a lapse in the gasoline policy resulted in a constitutional deprivation to Walters. DYS policy forbids youth from having access to or use of gasoline unless under direct and constant supervision. (PSAMF, ¶82). Walters contends that it was a violation of the gasoline policy for staff to be more than an arm's length away from the gasoline in April of 2011, when the gasoline was not locked and secured in the shed. (PSAMF, ¶83). Walters, however, cannot demonstrate when or who violated this policy to allow J.L. to obtain the gasoline. Moreover, the mere failure to follow policies alone does not rise to the level of a constitutional violation. *See Buckley*, 997 F.2d at 495; *Hott*, 260 F.3d at 907-08.

- Double Coverage Policy

Likewise, the purported violation of the double coverage policy does not support a violation of Walters' constitutional rights. Walters claims that had staff exercised double coverage during the evening shift, J.L. would have been identified before he got out of his bed, poured gasoline on Walters, and set Walters on fire. (PSAMF, ¶167). In his briefing, Walters clarifies that he asserts a claim only against Defendants Bryant, Armes and Jackson with respect to the double coverage policy. (ECF No. 142 at 22). Walters was injured when one employee was using the restroom.

The Court does not believe there was a violation of the double coverage policy because Armes and Jackson were both on duty at the time the incident occurred. Although Defendant

Bryant clarified that she would only leave the group once everyone was in bed and there was "nothing ... going on," the incident did not occur during one of those times because there were clearly two people supervising the Alpha residents. (ECF No. 142 at 22). Moreover, there is no indication that the purported violation of the double coverage policy in any way contributed to Walters' injury. Walters has not identified how the alleged violation of this particular policy resulted in a constitutional deprivation. *See Buckley*, 997 F.2d at 495; *Hott*, 260 F.3d at 907-08. Likewise, Walters cannot even demonstrate that violation of this policy resulted in the injury to J.L.

- Bedtime Protocol

Finally, the Court holds that the evidence before the Court does not indicate that Defendants violated Walters' constitutional rights based upon any alleged violation of the bedtime protocol. Defendants assert that that Armes and Jackson were about to address J.L. regarding his descent from the top bunk when he set Walters on fire. (ECF No. 142 at 24; DSUMF, ¶150). Walters does not dispute that Armes and Jackson were about to address J.L. when J.L. set Walters on fire. (DSUMF, ¶150; RSUMF, ¶150). The Court finds no constitutional violation based upon the evidence before the Court related to the purported violation of the bed time protocol. *See Buckley*, 997 F.2d at 495; *Hott*, 260 F.3d at 907-08.

Thus, based upon the foregoing, the Court grants Defendants' Motion for Summary Judgment with respect to Walters' claim that Defendants were deliberately indifferent to his constitutional rights based upon any policy violation.

**3. Failure to Train**

Defendants claim that Defendants Armes, Bryant, Burchard, Adams, Jerry Cooper, Jackson, Paula Shaw, Donna Nichols, Elaine Barbee, Janet Smiley, Kimberly Gosney, Tim

Decker, Don Pokorny, and Scott Barron were not responsible for training at Sears. (ECF No. 123 at 18). Defendants also note that each Sears staff member undergoes an orientation and training curriculum at the Regional Office.

Defendants contend that the training at Sears passes constitutional scrutiny. Defendants contend that Defendants Armes, Bryant, Burchard, Adams, Jerry Cooper, Jackson, Paula Shaw, Donna Nichols, Elaine Barbee, Janet Smiley, Kimberly Gosney, Tim Decker, Don Pokorny, and Scott Barron were not responsible for training at Sears. (ECF No. 123 at 18). In addition, Defendants maintain that each Sears staff member undergoes an orientation and a training curriculum at the Regional Office, which includes a large number of two or three day trainings. (ECF No. 123 at 18). Defendants note that training in awareness supervision for Sears employees included 40 hours of observation when the staff first is hired. Staff also receives 250 hours of adolescent and child care training. Each Sears employee receives hands on training from Defendant Stewart, including training to be engaged, to monitor interactions between kids, and to monitor which youth are connecting, what subgroups are forming, and whether the youth are dressed properly. (ECF No. 123 at 19). Stewart also provides hands-on training regarding recognizing suspicious behavior and changes in behavior. (ECF No. 123 at 19). Finally, new employees always work with non-probationary employees for their first nine months. (ECF No. 123 at 19).

In response, Walters argues that DYS is liable for failure to train Defendants Bryant and Jackson. (ECF No. 32 at 38). Walters notes that "[a] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983. (Opposition at 31 (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("a local government's decision not to train certain

- 27 -

employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983")). In Walters' Opposition, he does not argue that he is bringing a failure to train claim against any individual Defendants. (Opposition at 31-32; ECF No. 142 at 19-20, n.1).[10] Instead, Walters now claims that he has brought claims against Defendants in their official capacities because the Second Amended Complaint is not pleaded against the Defendants in their "individual capacities only." (ECF No. 154 at 4).

As the Court previously discussed with respect to municipal policy claims, Walters cannot state a claim under §1983 against the state or its officials in their official capacity for failure to train. Therefore, a failure to train action cannot be brought against DYS because it is a state entity. *See Will*, 491 U.S. at 71; *cf. City of Canton*, 489 U.S. at 388 (a local government may be subject to § 1983 liability for "inadequate training of its employees"). For that reason alone, Walters' failure to train claim fails as a matter of law as to DYS and Defendants in their official capacities. In addition, the Court holds that Walters has failed to demonstrate how a failure to train any individual Defendant resulted in the deprivation of Walters' constitutional rights. For that additional reason, Walters' failure to train claim fails as a matter of law and the Court grants summary judgment in favor of Defendants on this ground.

## C. Negligence Claims

Walters alleges that this Court has supplemental jurisdiction over Count II under 28 U.S.C. §1367. (SAC, ¶10). This Court grants summary judgment with respect to the §1983 claim in Count I, for which this Court has federal subject matter jurisdiction. The Court further declines to exercise supplemental jurisdiction for Count II under 28 U.S.C. §1367. The Court, therefore, dismisses Count II without prejudice. *See Brunson v. Morgan*, 2 F. App'x 684, 685

---

[10] The section of Walters' brief discussing failure to train is under the subheading "LIABILITY OF DYS STATE OF MISSOURI." (ECF No. 130 at 27).

(8th Cir. 2001) ("District Court did not abuse its discretion in declining to exercise supplemental jurisdiction over plaintiff's state law claims, but we modify the dismissal of those claims to be without prejudice.").

## II.    Motion to Quash

Because the Court grants Defendants' Motion for Summary Judgment, the Court need not address Defendants' Motion to Quash.

Accordingly,

**IT IS HEREBY ORDERED** that John/Jane Doe 1-10 are **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 122) is **GRANTED,** in part. The Court **GRANTS** Defendants' Motion for Summary Judgment as to Count I and that claim is **DISMISSED** with prejudice. The Court declines to exercise supplemental jurisdiction over Count II of Plaintiff's Second Amended Complaint and that claim is **DISMISSED** without prejudice.

An appropriate Judgment is filed herewith.


Dated this 28th day of July, 2015.


**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

- 29 -